IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| R.F. TECHNOLOGIES, INC., | ) | |
| an Illinois corporation | ) | |
| | ) | Case No. 16-cv-604 |
| Plaintiff, | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| v. | ) | |
| | ) | |
| LS RESEARCH, LLC, a Wisconsin | ) | |
| limited liability company, | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

Plaintiff R.F. Technologies, Inc. ("RFT"), for its Complaint against Defendant LS Research, LLC ("LSR"), states as follows:

## NATURE OF THE ACTION

1.       This action involves claims against LSR for breach of its contract with RFT to design and develop RFT's Drive-Thru System Headset and Base System.

2.       The contract at issue set forth five phases of work to be completed, with a scheduled end date of October 2013 and an estimated budget of $385,000 to $475,000.

3.       To date, LSR has invoiced RFT for over $1,100,000.00, yet LSR has failed to perform the contract by the deadlines, and is unable to perform the work required by the contract.

4.       RFT seeks rescission of the contract, damages, and its reasonable attorneys' fees as permitted under the contract for LSR's substantial nonperformance, breach of the contract, and breach of the covenant of good faith and fair dealing.

## THE PARTIES

5.       Plaintiff RFT is an Illinois corporation, doing business throughout Illinois and the United States and is a citizen of Illinois, having its principal place of business in Illinois.

6.     Defendant LSR is a Wisconsin limited liability company doing business in Illinois and having its principal place of business in Wisconsin.  Upon information and belief, LSR's sole member is Laird, PLC, a foreign corporation with its principal place of business in London, England.  Therefore, LSR is a citizen of a foreign state.

## JURISDICTION AND VENUE

7.     This Court possesses original jurisdiction of this civil action based upon diversity of citizenship pursuant to 28 U.S.C. § 1332.  The matter in controversy exceeds $75,000, exclusive of interest and costs, and is between a citizen of a State and citizen of a foreign state.

8.     Venue is proper in the Southern District of Illinois pursuant to 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in the Southern District of Illinois and Defendant is subject to the court's personal jurisdiction with respect to this action.

## FACTUAL ALLEGATIONS

9.     For over two decades, RFT has serviced and repaired wireless communication devices including headsets for the Quick Service Restaurant industry.

10.     Prior to the events described herein, RFT did not manufacture and sell its own headset system for the Quick Service Restaurant industry.

11.     In 2012, RFT began investigating the prospects for developing a drive-thru system that included headsets and a base from which customers place orders.

## I.     THE PHASE 1 CONTRACT.

12.     On December 19, 2012, RFT and LSR signed an agreement, titled Terms and Conditions Governing Sales, "to provide the design services . . . described in the LS Research Proposal LSR278029," which proposal was incorporated into the agreement.  A true and

accurate copy of the Terms and Conditions and LS Research Proposal LSR278029 is attached hereto as Exhibit 1 and incorporated herein by reference.  The Terms and Conditions Governing Sales and LS Research Proposal LSR278029 (Exhibit 1) are collectively referred to as the "Phase 1 Contract."

13.    The Phase 1 Contract set forth LSR's statement of work for the "Drive Thru System Headset and Base Redesign – Phase 1" project.

14.    The Phase 1 Contract provided that the objective of the project was to "outline the functionality of the current system and propose a higher performing, more competitive system" as "part of a larger effort to complete the development of the new Drive Thru system."  Ex. 1, § II.A.

15.    The Phase 1 Contract provided that LSR would deliver to RFT, *inter alia*, System Requirement Documents, Hardware Architecture Documents, and Software Architecture Documents. Ex. 1, § III.A.

16.    The Phase 1 Contract was limited to the initial investigation stage.  LSR stated that it would "provide a formal development proposal which will include the statement of work and deliverables for phases 2 through 6 at the completion of phase 1." Ex. 1, § II.C.  The "Work Out of Scope" also explained that the following was excluded from the Phase 1 Contract: "Any work not specified within this SOW [Scope of Work], including the development tasks.  At the conclusion of phase 1, LSR will deliver a formal proposal for the development." Ex. 1, § IV.C.

17.    The Phase 1 Contract provided an estimated budget of $58,180.00.  Ex. 1, § VI.A.

18.    On December 20, 2012, LSR submitted to RFT Invoice Number 515413, in the amount of $51,180.00, due upon receipt.  RFT paid said invoice with check number 46960 dated December 20, 2012.

19.     On March 11, 2013, LSR delivered to RFT the System Requirement Documents called for in the Phase I Contract, a copy of which is attached hereto as Exhibit 2.

20.     The System Requirement Documents provided a list of design features for the drive-thru system, and indicated that:

- ***Shall*** identifies a requirement which must be met – is mandatory.

Ex. 2, Sys. Req. Docs., "Page 7 of 29."

21.     From the outset, the System Requirement Documents indicated the system/functional requirements for the drive-thru ***shall*** include, *inter alia*: two drive-thru lanes; wireless operation of up to 12 headsets; audio noise reduction in the headset microphone and from the drive-thru back to the headset; audio function that includes the order taker and customer conversation.  Ex. 2, Sys. Req. Docs., "Page 10 of 29," "Page 13 of 29."

## II.     THE PHASE 2-5 CONTRACT.

22.     On March 25, 2013, RFT and LSR signed an agreement, titled Terms and Conditions Governing Sales, "to provide the design services (the 'Services') . . . described in the LS Research Proposal LSR278071 (the 'Proposal')," which proposal was incorporated into the agreement.  A true and accurate copy of the Terms and Conditions and the Proposal is attached hereto as Exhibit 3 and incorporated herein by reference.  The Terms and Conditions Governing Sales and Proposal (Exhibit 3) are collectively referred to as the "Phase 2-5 Contract."

### A.     The Services To Be Provided Under The Phase 2-5 Contract.

23.     The Phase 2-5 Contract set forth LSR's statement of work for the "Drive Thru System Headset and Base Redesign – Phases 2-5" project.

24.     The Phase 2-5 Contract provided that the objective was "to revise [RFT's] existing prototype Drive Thru System with the intent to offer a more competitive solution" and that LSR would "implement the design outlined in LSR's phase 1 effort." Ex. 3, § II.A.

25.     The Phase 2-5 Contract further provided:

The new system will have the following core functionality/features:

- Modular DECT solution for base and headsets – goal range to be sufficient for 5000-7000 sq ft QSR

- Architect to handle at least 12 Hi-Fi headsets

- Touch screen display for base that runs an Android app

- Noise reduction for headsets – goal to be as good, if not better than Quail system

- Software updates via USB

- Ethernet

- Industrial design for base and headset

Ex. 3, § II.A.

26.     The Phase 2-5 Contract provided that the work would be performed in different phases, as follows:

- P2 – Development

- P3 – Alpha Prototype Testing

- P4 – Beta Prototype Testing

- P5 – Regulatory Testing

Ex. 3, § II.C.

27.     Section III of the Phase 2-5 Contract described each phase in detail.

28.     Section III.A (Phase 2) "describe[d] the approach to be followed for completing the hardware and software development" which included: hardware development; Computer-

5

Aided Design ("CAD") databases; detailed 3D modeling; prototyping; software development; internal review; and external design review.  Ex. 3, § III.A.1-7.

29.     With respect to Phase 2 external design review, the Phase 2-5 Contract provided that "LSR and RF Technologies will hold a formal phase 2 review either in person or via telephone/WebEx to review the phase 2 deliverables.  Pending RF Technologies review and feedback, LSR will update the documentation for final review and sign off by RF Technologies." Ex. 3, § III.A.7.

30.     Section III.B (Phase 3) "describe[d] the approach to be followed for the alpha hardware prototyping, including the prototype test plan" and "define[d] the design verification process" which included: hardware fabrication; update of 3D models; industrial design fabrication; hardware test plan; design verification testing; design validation testing; software testing and integration; internal design review; and external design review.  Ex. 3, § III.B.1-9.

31.     With respect to Phase 3 external design review, the Phase 2-5 Contract provided that "LSR and RF Technologies will hold a formal phase 3 design review either in person or via telephone/WebEx.  Pending inputs from RF Technologies, LSR will update the CAD documentation and submit final phase 3 deliverables to RF Technologies for review and sign off. At this time, LSR will release the files for Beta prototype production.  Ex. 3, § III.B.9.

32.     Section III.C (Phase 4) "describe[d] the approach to be followed for the beta prototypes [which] will incorporate any design enhancements or circuit modifications resulting from the alpha prototype optimization phase."  Ex. 3, § III.D.  Phase 4 included: hardware fabrication; update of 3D models; industrial design fabrication and assembly; hardware test plan; design verification testing; design validation testing; hardware test results documentation; final

software testing and integration; internal design review; and external design review.  Ex. 3, § III.D.1-13.

33.     With respect to Phase 4 external design review, the Phase 2-5 Contract provided that "LSR and RF Technologies will hold a formal phase 4 design review either in person or via telephone/WebEx.  Pending inputs from RF Technologies, LSR will update the CAD documentation and submit final phase 4 deliverables to RF Technologies for review and sign off."  Ex. 3, § III.D.13.

34.     Section III.D (Phase 5) provided that "LSR will complete FCC and Industry Canada certification" and that "[a] formal quotation with a complete list of tests will be provided by LSR's compliance lab prior to commencing phase 5."  Ex. 3, § III.D.1.

**B.     The Budget For The Phase 2-5 Contract.**

35.     The Phase 2-5 Contract provided an estimated budget of $385,000 to $475,000, as follows:

| Phase | Deliverable | Estimated Budget |
|---|---|---|
| P2: Development | 1. Preliminary CAD Databases<br>   a. Schematic (PADS)<br>   b. PCB layout (PADS)<br>   c. Bill of Materials (Excel)<br>2. Preliminary source code<br>3. Rapid Prototype for headset and base | $190K –$220K |
| P3:  Alpha Prototype Testing | 1. Updated CAD database<br>   a. Schematic (PADS)<br>   b. PCB Layout (PADS)<br>   c. Bill of Materials (Excel)<br>2. Hardware Test Results Document<br>   a. Test Specifications<br>   b. EMC Pre-scan Results<br>   c. Characterization data<br>3. Software Source Code<br>4. Prototypes for headset and base | $100K - $130K |
| P4:  Beta Prototype Testing | 1. Final CAD database<br>   a. Schematic (PADS)<br>   b. PCB Layout (PADS)<br>   c. Bill of Materials (Excel)<br>2. 20 Headsets and 3 Bases<br>3. Hardware Test Results Document<br>   a. Test Specifications<br>   b. EMC Pre-scan Results<br>   c. Characterization data<br>4. Updated Software Source Code<br>5. Production representative prototypes for headset and base | $70K –100K |
| P5:  EMC Certification | 1. FCC/IC Testing (co-located radio), Reporting, and Filing | $25K |
| **Total Labor Fees** | | **$385K - $475K** |

Ex. 3, § VI.A.

36.     The Phase 2-5 Contract provided that RFT "will be notified in advance if the estimated budget will be exceeded."  Ex. 3, § VI.A.

**C.     The Schedule for the Phase 2-5 Contract.**

37.     The Phase 2-5 Contract provided a schedule, a copy of which is attached hereto as Exhibit 4 (the "Schedule").  Ex. 3, § V.I.

38.     The Schedule provided that Phases 2-5 would be finished on October 21, 2013. Ex. 4.

39.     The Schedule set forth completion of the following work within each phase as follows:

**Phase 2 –**
Industrial Design Development and Refinement . . . .   April 12, 2013

**Phase 2A –**
Hardware/CAD Development . . . . . . . . . . . . . . . . .   May 23, 2013

**Phase 2B –**
Software Design and Documentation . . . . . . . . . . .   August 27, 2013

**Phase 3 – Industrial Design**
Alpha Prototypes . . . . . . . . . . . . . . . . . . . . . . . . . .   May 28, 2013

**Phase 3A –**
Alpha Prototype Testing . . . . . . . . . . . . . . . . . . . . .   July 30, 2013

**Phase 3B –**
Software Testing . . . . . . . . . . . . . . . . . . . . . . . . . . .   July 31, 2013

**Phase 4 – Industrial Design**
Beta Prototypes . . . . . . . . . . . . . . . . . . . . . . . . . . .   July 29, 2013

**Phase 4A –**
Beta Prototype Testing . . . . . . . . . . . . . . . . . . . . . .   September 9, 2013

**Phase 5 –**
Regulatory Testing . . . . . . . . . . . . . . . . . . . . . . . . .   October 21, 2013

Ex. 4, pp. 1-2.

### D.     <u>Additional Terms And Conditions Of The Phase 2-5 Contract.</u>

40.     The Phase 2-5 Contract included a *force majeure* clause providing that LSR

would not be responsible for delays beyond its control, but did not limit LSR's liability for

delays within LSR's control:

> <u>Delivery</u>.  Delivery dates are approximate.  LS Research shall not
> be liable to Client for delays in its performance due to war, riot,
> civil disorder, fire, strikes, work slow-downs, accidents, actions of
> government or civil authority, delay in transportation, energy
> failure, equipment breakdown, delay of suppliers, inability to
> obtain necessary labor, materials or manufacturing facilities, acts
> of God or any causes beyond the control of LS Research.

Ex. 3, ¶ 9.

41.     The Phase 2-5 Contract provided that the price quotation set forth in the Proposal

covered the Services set forth in the Proposal, excluding LSR's costs incurred to acquire parts or

materials, taxes, regulatory compliance testing, and certain out-of-pocket expenses incurred on

RFT's behalf, and could be modified prior to acceptance by RFT.

> 4.  <u>Price</u>.  The price quotation in the Proposal covers only the
> Services.   Client shall reimburse LS Research for any costs
> incurred by LS Research to acquire parts or other materials.  Prices
> are F.O.B. LS Research's Cedarburg, Wisconsin facility.  Client
> shall pay any tax, duty, approvals or other fee or charge imposed in
> connection with or measured by the transaction between LS
> Research and Client.  Any quotation is effective only for 30 days
> from the date it is made and LS Research may withdraw or modify
> any quotation prior to its acceptance by Client.  The Services do
> not include, unless specifically stated in the proposal, compliance
> and/or other verifications, testing and/or submittals for product
> approvals, including, without limitation, FCC and CE testing and
> reporting, and product failure evaluation.   LS Research shall
> provide Client, in advance when reasonably possible, written
> notice prior to Client incurring any additional costs pursuant to this
> paragraph.
>
> 5.  <u>Expenses</u>.  Expenses which are incurred on the Client's behalf
> will be invoiced as follows:  Out-of-pocket expenses incurred in
> performing   the   Services,   including,   without   limitation,

> components, PCB material, shipping charges, long distance
> telephone charges, will be invoiced at cost plus 20%. Travel
> expenses will be invoiced at cost plus 5%. Mileage will be
> invoiced at the prevailing federal cents per mile rate.

Ex. 3, ¶¶ 4, 5.

42. The Phase 2-5 Contract provided that RFT had to provide an advance payment of

fifty percent (50%) of the estimate project cost prior to initiation of the Services. Ex. 3, ¶ 8.

43. The Phase 2-5 Contract provided that RFT had 30 days to pay all invoices, and

stated that if RFT did not pay any amount due, LSR could terminate the agreement, declare

immediately due all of RFT's obligations to LSR, and charge interest on the amount-past-due:

> Payment. Payment terms are net 30 days from the date of LS
> Research's invoice. If Client does not pay LS Research any
> amount due under this Agreement, LS Research may (a) terminate
> this Agreement, (b) declare immediately due and payable all of
> Client's obligations to LS Research, (c) change credit terms with
> respect to any further work, (d) suspend or discontinue any further
> work until Client pays all overdue amounts and/or (e) retain all
> proprietary and other intellectual property rights in the Designs.
> Client shall pay interest on all past-due amounts at the rate equal to
> the lower of 1% per month, compounded on a daily basis, or the
> highest rate permitted by applicable law.

Ex. 3, ¶ 11.

44. A separate section of the Phase 2-5 Contract provided that RFT would have 30

days to approve or provide written objections to LSR's work after the completion of each phase.

The Phase 2-5 Contract did *not* provide that payment of invoices amounted to approval of work:

> Approval. Client acknowledges and agrees that the Services will
> be performed by LS Research in various phases. Upon completion
> of each phase, Client shall have 30 days to provide LS Research
> with written objections to the Services provided during such phase.
> If Client approves of the Services or fails to provide written notice
> of its objection within such 30-day period, Client shall be deemed
> to unconditionally accept the Services performed during such
> phase.

Ex. 3, ¶ 12.

45.     The Phase 2-5 Contract provided that LSR "will use its discretion to perform the

Services."  Ex. 3, ¶ 13.

46.     The Phase 2-5 Contract provided that a non-breaching party would recover its

attorneys' fees in an action on the contract:

> Attorneys' Fees and Costs.  In the event this Agreement of any of
> its covenants is breached by either party, the nonbreaching party
> shall be entitled to any and all remedies available at law or in
> equity and shall be entitled to recover all reasonable attorneys' fees
> and costs of litigation incurred in enforcing the terms, conditions,
> and covenants of this agreement or in obtaining an award of
> damages.

Ex. 3, ¶ 15.

47.     The Phase 2-5 Contract is to be governed by Illinois law.  Ex. 3, ¶ 16.

**III.     LSR FAILS TO PERFORM THE PHASE 2-5 CONTRACT.**

**A.     LSR Invoices And Collects $310,627.57 From RFT Under The Phase 2-5 Contract Through September 2013.**

48.     On March 28, 2013, LSR sent RFT Invoice Number 515820 for $95,000.00,

which represented an advance payment set forth in the Phase 2-5 Contract.  A copy of this

invoice, along with all other invoices submitted by LSR to RFT, is attached hereto as Exhibit 5.

49.     RFT paid Invoice Number 515820 on or about April 5, 2013.

50.     Thereafter, between March 29, 2013 and September 30, 2013, LSR invoiced RFT,

and RFT paid, a total of $215,627.57, as follows:

| Amount | Description | Invoice # | Invoice Date |
|---|---|---|---|
| $3,577.37 | Development | 515892 | 03/29/13 |
| $493.45 | Direct Project Costs | 515923 | 03/29/13 |
| $21,113.75 | Development | 516029 | 04/30/13 |

| Amount | Description | Invoice # | Invoice Date |
|---|---|---|---|
| $33,174.37 | Development | 516237 | 05/31/13 |
| $20,142.50 | Development | 516392 | 06/28/13 |
| $332.10 | Direct Project Costs | 516428 | 06/28/13 |
| $310.07 | Direct Project Costs | 516445 | 06/28/13 |
| $14,820.00 | Development | 516567 | 07/31/13 |
| $3,781.29 | Direct Project Costs | 516588 | 07/31/13 |
| $2,341.44 | Direct Project Costs | 516793 | 08/30/13 |
| $26,808.00 | Development | 516754 | 08/31/13 |
| $65,000.00 | Advance Payment on Phase 3 | 516734 | 09/10/13 |
| $22,976.25 | Development | 516914 | 09/30/13 |
| $756.98 | Direct Project Costs | 516983 | 09/30/13 |

51.     LSR's invoices for services did not contain a detailed description of the work performed.  *See* Ex. 5.

**B.     LSR Fails To Meet The Deadlines And Requirements Of The Phase 2-5 Contract And Estimates A February/March 2014 Completion Date.**

52.     LSR failed to complete Phase 3 and deliver an Alpha Prototype by July 2013, and to complete regulatory testing by October 2013.

53.     On November 22, 2013, RFT's Vice President of Operations, Scott Crause, emailed LSR's Program Manager, Aaron Arbiture, requesting an estimated project completion date.  The same day, Arbiture responded that "we should be wrapping everything up in the late February/early March timeframe given the info we know today."  A copy of the email chain is attached hereto as Exhibit 6.

C.    **LSR Fails to Meet the March 2014 Deadline Despite Collecting An Additional $278,965.62 From RFT.**

54.    In late January 2014, LSR and RFT scheduled a time to review a demonstration of an Alpha prototype.  On January 29, 2014, LSR's Aaron Arbiture explained in an email, attached hereto as Exhibit 7, that the demo would not include a test of any software for noise reduction:

> The SW [software] team is still progressing along and has been supporting John with the troubleshooting of the issues for the demo.  The first pass of noise cancellation software should be ready shortly, but we will likely need to do the testing for that on the next spin of hardware.  Per our earlier conversations, this demo was not going to be able to support the noise cancellation code. . . .

Ex. 7, p. 2.

55.    Noise reduction was a functional requirement identified in both the Phase 1 Contract and the Phase 2-5 Contract.  See ¶¶ 21, 25 above.

56.    LSR failed to meet the late February/early March 2014 completion date.

57.    From October 2013 through January 2014, LSR invoiced RFT, and RFT paid, a total of $278,965.62, as follows:

| Amount | Description | Invoice # | Invoice Date |
|---|---|---|---|
| $26,660.00 | CAD, Engineering, Software, Tech Services | 517182 | 10/31/13 |
| $9,703.12 | ID/ME Services | 517183 | 10/31/13 |
| $14,686.02 | Direct Project Costs | 517160 | 10/31/13 |
| $67,371.87 | Hardware, CAD, Software, Tech, ID/ME Services | 517313 | 11/29/13 |
| $10,424.15 | Direct Project Costs | 517329 | 11/29/13 |
| $4,190.05 | Direct Project Costs | 517479 | 12/30/13 |

| Amount | Description | Invoice # | Invoice Date |
|---|---|---|---|
| $52,010.00 | CAD, Hardware, Software, Tech, Project Management, ID/ME Services | 517468 | 12/31/13 |
| $89,833.75 | CAD, Hardware, Software, Tech, IDME | 517685 | 01/31/14 |
| $4,086.66 | Direct Project Costs | 517688 | 01/31/14 |

Ex. 5.

D. **LSR Submits A Proposal For Additional Work Needed To Complete The Phase 2-5 Contract By September 2014 With A Price Tag Of Several Hundred Thousand Dollars Above What RFT Had Already Paid.**

58.     On or about February 19, 2014, LSR sent RFT a PowerPoint presentation outlining additional work and expense needed to complete the Phase 2-5 Contract (the "Additional Work Proposal").  A true and accurate copy of the Additional Work Proposal is attached hereto as Exhibit 8.

59.     The Additional Work Proposal described CAD, hardware, and software tasks that were required to implement the Phase 1 system requirements, including, *inter alia*:

- USB boot of DSPs and command interface to DSPs from I2C

- System clocking architecture

- Anticipated modifications to TI VAD algorithm for noise gate

- Audio tuning of echo canceller

- Integration of noise gate into audio routing software

- Android application revisions and integration.

Ex. 8, p. 14.

60.     The Additional Work Proposal provided a cost summary that more than doubled the price of the original Proposal:

|  | **Original** | **Actual/Projected** | **Delta** |
|---|---|---|---|
| Hardware | $120,000 | $238,165 | $118,165 |
| CAD | $22,000 | $46,094 | $24,094 |
| Tech | $10,000 | $17,850 | $7,850 |
| Software | $225,000 | $485,339 | $260,339 |
| Industrial Design | $72,000 | $137,800 | $65,800 |
| Total | $449,000 | $925,248 | $476,248 |

Ex. 8, p. 17.

61.     The Additional Work Proposal provided that the Drive Thru System would be completed by September 24, 2014, with the following schedule:

Alpha Prototype Testing (Phase 3). . . . . . . . . . . . . .   May 16, 2014

Hardware/Tech/CAD . . . . . . . . . . . . . . . . . . . . . .   June 27, 2014

Beta Prototype Testing (Phase 4) . . . . . . . . . . . . . .   June 27, 2014

Regulatory Testing (Phase 5) . . . . . . . . . . . . . . . . .   September 24, 2014

**RFT Drive Thru System** . . . . . . . . . . . . . . . . . . . .   **September 24, 2014**

Ex. 8, p. 18.

62.     On February 27, 2014, LSR's Vice President of Operations, Dan Plach, sent an email to RFT's President, Bob Noorian, attached hereto as Exhibit 9, in which Plach: (1) recommended that LSR forego work on the development board and move directly to working on the Beta boards; (2) described how LSR could deliver a system with a limited set of features to get to the restaurant testing phase sooner; (3) explained that LSR ran into unexpected issues

16

during development; and (4) offered to reduce LSR's rates by 25% for the work going forward

(but not costs), for a total estimated project cost of $831,000:

> After our meeting on Thursday, I met with the project team to weigh the technical risks vs costs associated with the predicted effort and we feel strongly that forgoing the development board work and moving directly to Beta boards will be the best risk/reward option. . . .  Per your request, we looked at scenarios that would enable delivery of a system with a limited set of features (i.e. set up for only one lane) to get to the restaurant testing phase sooner.  Due to the need for echo cancellation and the noise gate in any test system, and the fact that these items largely comprise the remaining work, the effort is not appreciably different compared to the time and effort needed to finish the whole system. Knowing that you want to get units in a restaurant for testing as quickly as possible, however, we would work to prioritize all efforts for that goal.
>
> . . . . Based on current estimates, the 25% reduction would lead to a estimated total project costs of $831k (an estimated reduction of $120,000).  Note that there would still be material costs outside of this number, however.

Ex. 9, pp. 1-2.

63.     RFT accepted LSR's proposal on March 1, 2014.  Ex. 9.

**E.**     **LSR Fails To Perform the Additional Work Proposal and Meet The September 2014 Deadline Despite Collecting An Additional $295,359.08 From RFT.**

64.     From February 2014 through September 2014, LSR invoiced RFT, and RFT paid,

a total of $296,438.79, as follows:

| Amount | Description | Invoice # | Invoice Date |
|---|---|---|---|
| $873.22 | Direct Project Costs | 517821 | 02/28/14 |
| $40,918.75 | CAD, Hardware, Software, Tech, IDME | 517870 | 02/28/14 |
| $2,750.00 | Certification and EMC Testing | 518005 | 03/28/14 |
| $15,000.00 | Development | 518081 | 03/31/14 |

| Amount | Description | Invoice # | Invoice Date |
|---|---|---|---|
| $335.37 | Direct Project Costs | 518134 | 03/31/14 |
| $22,000.00 | Development | 518305 | 04/30/14 |
| $744.34 | Direct Project Costs | 518334 | 04/30/14 |
| $1,455.09 | Direct Project Costs | 518547 | 05/30/14 |
| $15,000.00 | Development | 518507 | 05/31/14 |
| $50,000.00 | Alpha Prototype Testing | 518737 | 06/30/14 |
| $2,050.14 | Direct Project Costs | 518760 | 06/30/14 |
| $50,000.00 | Alpha Prototype Testing | 519021 | 07/31/14 |
| $106.40 | Direct Project Costs | 519041 | 07/31/14 |
| $1,650.00 | Certification and EMC Testing | 519217 | 08/26/14 |
| $338.20 | Direct Project Costs | 519289 | 08/29/14 |
| $50,000.00 | Alpha Prototype Testing | 519300 | 08/31/14 |
| $1,100.00 | Certification and EMC Testing | 519333 | 08/31/14 |
| $30,000.00 | Alpha Prototype Testing | 519511 | 09/30/14 |
| $11,037.57 | Direct Project Costs | 519562 | 09/30/14 |

Ex. 5.

65.     LSR failed to meet the September 24, 2014 completion date.

**F.      To Date, LSR Has Failed To Deliver A Working Prototype Pursuant To The Phase 2-5 Contract And Additional Work Proposal Despite Collecting Over $1,100,000 From RFT.**

66.     In September 2014, LSR advised RFT that it needed additional time to complete the work.

67.     In March 2015, after reviewing another demonstration, RFT informed LSR of issues related to audio, including unclear audio in the headset, lack of noise cancellation, a hum

18

emanating through the outside speaker, and a click heard through the outside speaker when the headset was pressed.

68.    After providing this, and other feedback, LSR indicated it would revise the software to correct the issues and provide a field-worthy test unit.

69.    On April 28, 2015, RFT received a software revision.  After testing this revision, RFT found many of the previously-identified problems still present, and provided LSR feedback on these issues, which included, *inter alia*:

- Unclear and non-crisp inbound audio;

- Inability to test noise reduction pending resolution of clarity issues;

- Hum emanating through the outside speaker;

- Inability to test noise reduction pending resolution of humming;

- Audible "click" heard through outside speaker when headset is pressed;

- Inability for duplex audio (ability of order taker and customer to speak at the same time);

- Touch-screen not sensitive enough; and

- Low volume on the headset.

70.    On May 21, 2015, having received no proposed resolution of these issues from LSR, Noorian emailed LSR with his concern with LSR's work and substantial failure and inability to perform:

> It appears that the full duplex function of the system does not work due to software glitches with ADT and since the 90 days trial period has elapsed, they are requiring more money to resolve.
>
> I believe that the existing problem is a fundamental problem which existed since the very first time that we came up to LSR to hear the system, and should have been addressed by the LSR team to ADT. As a matter of fact, it is such an obvious problem which should have been addressed by the LSR engineers from the get go without any involvement from RFT.  Furthermore, following our last

> conversation, we agreed that the current outstanding PO should get
> this system to a stage where it can be installed and tested in a
> restaurant.  The current system is nowhere near that stage.

A copy of this email is attached hereto as Exhibit 10.

71.    On or about July 13, 2015, LSR and RFT tested the system again, and RFT

provided feedback for the previously-discussed problems that had not been fixed.

72.    On July 14, 2015, RFT's Noorian emailed LSR, a copy of which is attached

hereto as Exhibit 11, requesting LSR's plan to complete the project:

> I just want to let you know how disappointed I am at your
> presentation yesterday.  It seems as though you guys have no idea
> how to check some of the most basic parameters of the system.
> After almost 3 years and over a $1,000,000 of investment on my
> part in this project, it seems clear that either your team or LSR as a
> company does not have the engineering capability to complete this
> project in a satisfactory manor and on timely biases.
>
> I would like to know exactly what your organization will do to
> bring this project to satisfactory conclusion.

73.    On July 15, 2015, LSR's Arbiture emailed RFT:  "Based on the results of the

Monday testing and your feedback, here is the list of items we will plan to update in order to get

to a restaurant ready system.  Our goal is to have all of these changes implemented by 7-24."  A

copy of this email is attached hereto as Exhibit 12.

74.    The items to update for a restaurant ready system included:

- Reduce buzz/hum of open mic noise when headsets are in a call by 50% of
  currently noted levels . . . which should put it to approximately the same
  levels of white noise currently observed on the Quail headsets; and

- Match volume levels to be consistent when in page function and team call,
  levels will be set to minimize occurrence of clipping during recording of
  messages;

- Make gain changes in the attempt to improve full duplex performance so that
  neither the headset or post take over during a simultaneous conversation; and

- Updates to the Android application.

20

Ex. 12, p. 2.

75.     LSR also listed "[i]tems to be addressed at a later date and not needed for

restaurant testing," which included "[i]mplementation of noise gate on mic board."  Ex. 12, p. 2.

76.     The revisions proposed by LSR were not made by July 24, 2015, and, in fact,

LSR never provided a system with these revisions.

77.     LSR subsequently requested additional time to complete the work set forth in the

Phase 2-5 Contract.  RFT did not agree to any further extensions.

78.     From October 2014 through September 2015, LSR invoiced RFT, and RFT paid,

a total of $287,630.19, as follows:

| Amount | Description | Invoice # | Invoice Date |
|---|---|---|---|
| $9,891.00 | Alpha Prototype Testing | 519797 | 10/31/14 |
| $3,867.04 | Direct Project Costs | 520026 | 11/28/14 |
| $42,954.00 | Additional Prototyping - October | 520123 | 11/30/14 |
| $61,833.75 | Additional Prototyping - November | 520124 | 11/30/14 |
| $32,943.75 | Additional Prototyping – December | 520238 | 12/31/14 |
| $2,725.95 | Direct Project Costs | 520174 | 12/31/14 |
| $44,073.75 | Beta Labor - January | 520437 | 01/31/15 |
| $1,825.97 | Direct Project Costs | 520381 | 01/31/15 |
| $47,095.00 | Beta Labor – February | 520590 | 02/28/15 |
| $764.66 | Direct Project Costs | 520603 | 02/28/15 |
| $37,689.00 | Beta Labor – March | 520813 | 03/31/15 |
| $157.89 | Direct Project Costs | 520837 | 03/31/15 |
| $77.72 | Direct Project Costs | 521253 | 05/31/15 |
| $77.76 | Direct Project Costs | 521418 | 06/30/15 |

| $709.62 | Direct Project Costs | 521638 | 07/31/15 |
|---|---|---|---|
| $102.29 | Direct Project Costs | 521871 | 08/31/15 |
| $841.04 | Direct Project Costs | 522063 | 09/30/15 |

Ex. 5.

## COUNT I
## Rescission for Substantial Non-Performance

79.     Plaintiff incorporates by reference each and every allegation set forth above.

80.     The Phase 2-5 Contract provided that LSR would "implement the design outlined in LSR's phase 1 effort" and would perform work in Phases 2-5 to design, test, and deliver a working Drive Thru System to RFT by October 21, 2013.

81.     The work to be performed by LSR, as set forth in the Phase 2-5 Contract and any subsequent amendments thereto, was a material term of the Phase 2-5 Contract in that it formed the basis of the bargain between LSR and RFT, and RFT would not have entered the Phase 2-5 Contract without such terms.

82.     As set forth above, LSR failed to perform the Work set forth in the Phase 2-5 Contract by the deadlines, or by any extensions thereto, due to either LSR's non-performance and/or LSR's inability to perform.

83.     LSR has been, and continues to be, unable to perform the Phase 2-5 Contract, and, to date, has failed to implement the design outlined in LSR's phase 1 effort or deliver a Drive Thru System ready for restaurant testing.

84.     Despite LSR's inability to perform the Phase 2-5 Contract, LSR has nonetheless invoiced RFT, and RFT has paid the invoices pursuant to deadlines, and to avoid the penalties, set forth in the Phase 2-5 Contract, in excess of $1,000,000.00.

85.     RFT has made demand upon LSR for rescission by offering to return all equipment, drawings, and other materials delivered by LSR in exchange for LSR returning LSR to the *staus quo ante*, but LSR has refused.

WHEREFORE, Plaintiff prays that this Court enter its Judgment in favor of Plaintiff on Count I of its Complaint and award Plaintiff the following relief:

A.     That the Phase 2-5 Contract, and all amendments thereto, be rescinded, with Plaintiff to recover all amounts paid pursuant to such Contract;

B.     Plaintiff's attorneys' fees and costs;

C.     pre-judgment and post-judgment interest in an amount provided under the law; and

D.     such other and further relief as the Court deems just and proper.

## COUNT II
## Breach of Contract (Alternatively to Count I)

86.     Plaintiff incorporates by reference each and every allegation set forth above.

87.     The Phase 2-5 Contract provided that LSR would "implement the design outlined in LSR's phase 1 effort" and would perform work in Phases 2-5 to design, test, and deliver a working Drive Thru System to RFT by October 21, 2013.

88.     The work to be performed by LSR, as set forth in the Phase 2-5 Contract and any subsequent amendments thereto, was a material term of the Phase 2-5 Contract in that it formed the basis of the bargain between LSR and RFT, and RFT would not have entered the Phase 2-5 Contract without such terms.

89.     As set forth above, LSR breached the Phase 2-5 Contract by failing to perform the work set forth in the Phase 2-5 Contract by the deadlines, or by any extensions thereto, due to either LSR's non-performance and/or LSR's inability to perform.

90.     LSR has been, and continues to be, unable to perform the Phase 2-5 Contract, and, to date, has failed to implement the design outlined in LSR's phase 1 effort or deliver a Drive Thru System ready for restaurant testing.

91.     Despite LSR's inability to perform the Phase 2-5 Contract, LSR has nonetheless invoiced RFT, and RFT has paid the invoices pursuant to deadlines, and to avoid the penalities, set forth in the Phase 2-5 Contract, in excess of $1,000,000.00.

92.     As a result of Defendant's breach, Plaintiff has been damaged in an amount in excess of $75,000.00, exclusive of interest and costs.

WHEREFORE, Plaintiff prays that this Court enter its Judgment in favor of Plaintiff on Count II of its Complaint and award Plaintiff the following relief:

A.     Plaintiff's actual damages, in an amount in excess of $75,000.00 to be proved at trial;

B.     Plaintiff's attorneys' fees and costs;

C.     pre-judgment and post-judgment interest in an amount provided under the law; and

D.     such other and further relief as the Court deems just and proper.

### COUNT III
### Breach of Good Faith and Fair Dealing

93.     Plaintiff incorporates by reference each and every allegation set forth above.

94.     The Phase 2-5 Contract provided that LSR would "implement the design outlined in LSR's phase 1 effort" and would perform work in Phases 2-5 to design, test, and deliver a working Drive Thru System to RFT by October 21, 2013.

95.     The Phase 2-5 Contract provided that LSR "will use its discretion to perform the Services."  Ex. 3, ¶ 13

96.     LSR's ability to exercise its discretion to perform the work set forth in the Phase 2-5 Contract is subject to the implied covenant of good faith and fair dealing, which duty requires LSR to exercise its discretion reasonably, in good faith, and not take any action in contravention of the parties' objectively reasonable expectations.

97.     LSR breached its duty of good faith and fair dealing by, *inter alia*:

- failing to perform the work described in Phases 2-5 by the deadlines set forth in the Phase 2-5 Contract;

- failing to inform RFT that LSR could not perform the work set forth in the Phase 2-5 Contract;

- continuously extending the deadlines to perform the work despite knowing LSR was unable to perform the work or meet the deadlines set forth in the Phase 2-5 Contract;

- failing to timely respond to RFT's feedback to provide deliverables that complied with the Phase 2-5 Contract;

- increasing the Phase 2-5 Contract price after realizing the deadlines could not be achieved despite knowing the work could not be performed;

- invoicing RFT in advance for work LSR knew could not and would not be performed;

- collecting money from RFT for services that LSR did not provide; and/or

- refusing to return money paid in advance by RFT for services that were promised but not provided.

98.     Despite LSR's inability to perform the Phase 2-5 Contract, LSR has nonetheless invoiced RFT, and RFT has paid the invoices pursuant to deadlines, and to avoid the penalties, set forth in the Phase 2-5 Contract, in excess of $1,000,000.00

99.     As a result of Defendant's breach, Plaintiff has been damaged in an amount in excess of $75,000.00, exclusive of interest and costs.

WHEREFORE, Plaintiff prays that this Court enter its Judgment in favor of Plaintiff on Count III of its Complaint and award Plaintiff the following relief:

  A. Plaintiff's actual damages, in an amount in excess of $75,000.00 to be proved at trial;

  B. Plaintiff's attorneys' fees and costs;

  C. pre-judgment and post-judgment interest in an amount provided under the law; and

  D. such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury as to all issues so triable.

GOLDENBERG HELLER
& ANTOGNOLI, P.C.

By: /s/ Mark C. Goldenberg
Mark C. Goldenberg #00990221
Kevin P. Green #06299905
2227 South State Route 157
Edwardsville, IL 62025
618-656-5150
618-656-6230 (fax)
mark@ghalaw.com
kevin@ghalaw.com

*Attorneys for Plaintiff R.F. Technologies, Inc.*